PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

WILLIAM ROBERT GRAY, JR.,
            *Petitioner-Appellant,*

v.

GERALD J. BRANKER, Warden,
Central Prison, Raleigh, North
Carolina,
            *Respondent-Appellee.*

}

No. 06-29

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
Terrence W. Boyle, District Judge.
(5:02-hc-00335-BO)

Argued: September 26, 2007

Decided: June 24, 2008

Before MICHAEL, GREGORY, and DUNCAN, Circuit Judges.

Affirmed in part, reversed in part, and remanded by published opinion. Judge Michael wrote the opinion, in which Judge Gregory joined. Judge Duncan wrote a separate opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Milton Gordon Widenhouse, Jr., RUDOLF, WIDEN-HOUSE & FIALKO, Chapel Hill, North Carolina, for Appellant. Steven Mark Arbogast, NORTH CAROLINA DEPARTMENT OF

JUSTICE, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Paul M. Green, Durham, North Carolina, for Appellant. Roy Cooper, Attorney General of North Carolina, Raleigh, North Carolina, for Appellee.

---

**OPINION**

MICHAEL, Circuit Judge:

William Robert Gray, Jr., was convicted of first degree murder and sentenced to death in North Carolina state court for the 1992 murder of his estranged wife. After the North Carolina courts rejected his direct appeal and denied post-conviction relief, Gray filed a petition for a writ of habeas corpus in U.S. district court, asserting several ineffective assistance of counsel claims. The district court denied all claims. We reverse in part, concluding that Gray is entitled to a new sentencing proceeding. This result is required because the North Carolina post-conviction court's denial of Gray's claim of ineffective assistance of counsel in the sentencing phase was contrary to, and an unreasonable application of, the standards set out in *Strickland v. Washington*, 466 U.S. 668 (1984). *See* 28 U.S.C. § 2254(d). Counsel rendered ineffective assistance by failing to investigate and develop, for sentencing purposes, evidence that Gray suffered from a severe mental illness, and it is reasonably probable that this failure prejudiced the outcome at sentencing. We conclude that the district court properly rejected Gray's claim that he was denied effective assistance of counsel because his lead lawyer was a potential defense witness and therefore labored under a conflict of interest. Finally, we conclude that the district court correctly held that two claims Gray asserted in an amendment to his federal habeas petition were barred by the statute of limitations.

I.

Gray was a dentist in Kinston, North Carolina. In mid-February 1992 his wife of twenty-two years, Roslyn Gray, told him that she intended to move out of their home and seek a divorce. The two separated in April of that year, and a contentious divorce proceeding

ensued with bitter disputes over child custody and property distribution. Gray, who remained in the home after the separation, was granted temporary custody of the couple's two children, an eleven-year-old son and an eight-year-old daughter.

In the months after Mrs. Gray announced her intentions and sued for divorce, Gray became increasingly distraught, emotional, and disturbed, according to his friends and associates. Gray "didn't have a grasp of what was going on," J.A. 822, and "didn't appear to be in his right mind," J.A. 802. For instance, Gray made "very agitated" telephone calls and visits to the office of Mrs. Gray's gynecologist, Dr. Marshall Jay Barker, who also had training in psychology. J.A. 782. In Dr. Barker's "medical opinion" Gray suffered from a "behavioral aberration and psychological problem" that included obsessive compulsion. J.A. 784, 224. The Grays briefly sought marital counseling, but the counselor withdrew because of her alarm about Gray's challenging and confrontational conduct. Mrs. Gray's lawyer sought a court order for a mental assessment of Gray, relying on affidavits from Dr. Barker and the marital counselor. Gray's divorce lawyer withdrew from the case, citing "irreconcilable differences" with Gray and difficulty communicating with him. J.A. 232. Gray retained his second divorce lawyer, Bob Worthington, on November 13, 1992.

Mrs. Gray had visitation privileges with the children at times specified by court order. The events that led to Gray's conviction for the murder of Mrs. Gray occurred at the end of the last visitation and are described as follows by the North Carolina Supreme Court:

> On [the evening of] 24 November 1992, [Mrs. Gray] went to [Gray's] house to leave their children after they had visited with her. [Gray] went outside and got into [Mrs. Gray's] Jeep. An eyewitness, who had been jogging on the street in front of [Gray's] house, testified that he observed a Jeep in the street. He heard screaming and yelling coming from the Jeep. He saw a woman break from the Jeep and run up the driveway. The man, whom the witness identified as [Gray], also ran from the vehicle. [Gray] then tackled the woman and straddled her. The two people were on the ground struggling, with [Gray] on top of [Mrs. Gray]. The witness stopped and asked what was going on, and [Gray] told him

to leave. [Mrs. Gray] said, "Mister, please don't leave. If you leave, he'll kill me." The jogger then heard a shot, and [Gray] ran behind the house.

[Mrs. Gray] was shot in the head. She died from this wound. [She] also suffered injuries from a stun-gun and a beating apparently with the butt of a pistol.

*State v. Gray*, 491 S.E.2d 538, 543-44 (N.C. 1997) (opinion on direct review).

The police arrested Gray later that night. At Gray's request, Worthington, his divorce lawyer hired eleven days earlier, was called to the police station. After Worthington arrived, he and Gray talked privately in an interview room, and Gray said he had been in the bathtub at the time of the shooting. Worthington and Gray were interrupted by a detective who asked whether Gray would submit to hand wipings for a gunshot residue test (a paraffin test). The detective left, and Worthington recommended that Gray submit to the test; Gray agreed and then asked for some water. Worthington went to the door and passed Gray's request to an officer, who brought Gray a soda can full of water. Gray, alone again with Worthington, used the water to wash his hands as Worthington watched. Worthington's instant reaction was, "Oh, shit," but he nevertheless allowed Gray to submit to the paraffin test. J.A. 1700. Shortly thereafter, at Worthington's urging, Gray gave a statement to the police, asserting his bathtub alibi.

In the following week Gray formally hired Worthington to represent him on the charge of first-degree murder. Worthington had never handled a capital case and had been involved in only one first-degree murder case. About fifty percent of his practice involved criminal cases.

Signs of Gray's unstable mental and emotional condition persisted after he was incarcerated in the Lenoir County Jail. He was placed on suicide watch, and the jail matron checked on him every fifteen minutes, noting in her log that he was "VERY depressed." J.A. 889-90. Gray told the matron that he had not slept for the previous two months. During his first week in jail, Gray, who seemed unable to focus, fainted during a visit by a friend. At the urging of the chief

jailer, Worthington filed a motion on November 30, 1993, asking the court to commit Gray for an evaluation of his capacity to proceed in the case. Worthington noted in the motion that Gray "appears in [a] state of shock and unable to appreciate the gravity of the situation." J.A. 240. The motion was granted immediately, and the next day, December 1, 1993, Gray was transferred to Dorothea Dix Hospital, a state psychiatric facility. As Gray was about to be moved, Worthington advised him to "be careful about what he said" at Dorothea Dix, and Gray responded that he understood. J.A. 1659.

At Dorothea Dix a forensic psychiatrist, Patricio Lara, M.D., evaluated Gray with respect to his capacity to proceed on the pending charge of murder. Dr. Lara based his evaluation on interviews with Gray, observations of his behavior, psychological testing, and a physical examination. Dr. Lara also had certain information from Worthington, the arresting officer, the jail, and Gray's friend, Donald Hollowell. As Dr. Lara emphasized, the information he was provided about Gray's "condition prior to the incident in question [was] quite limited." J.A. 46. Indeed, Worthington did not even give Dr. Lara the affidavits, contained in Gray's divorce file, of Dr. Barker (noting Gray's behavioral aberration and psychological problem) and the marital counselor (noting alarm about Gray's confrontational conduct). Dr. Lara's report described Gray as uncooperative and guarded. Nonetheless, Dr. Lara noted that Gray had been under ongoing stress prior to the shooting and that the "magnitude" of the stress "may have contributed to regression in behavior and reductions in impulse control." J.A. 45. While Dr. Lara found Gray competent to stand trial, he diagnosed Gray with "adjustment disorder with mixed disturbance of emotions and conduct," DSM (Diagnostic and Statistical Manual of Mental Disorders) category 309.40. J.A. 45. There was also evidence of "narcissistic traits with some features of paranoid nature." J.A. 44. Dr. Lara strongly suggested psychiatric counseling for Gray, stating that medication might become necessary. At the end of his report, Dr. Lara offered further assistance in Gray's case. If Dr. Lara could be provided additional information about "[Gray's] functioning and condition prior to [the incident in question]," he would endeavor to "expand [his] opinions" about Gray's condition at the time of the incident. J.A. 46.

Gray was returned to the Lenoir County Jail on January 6, 1993, after spending five weeks at Dorothea Dix. Copies of Dr. Lara's

report were provided to Worthington, Gray, and the court. Worthington took particular note of Dr. Lara's statement that the magnitude of stress in Gray's life prior to the shooting may have contributed to regressive behavior and loss of impulse control. As a result, Worthington promptly suggested to Gray that they hire an independent psychiatrist for further evaluation. Gray refused, telling Worthington "not to spend another f'ing penny on this trial, that he didn't need a psychiatrist," and that "[t]here was nothing wrong with him." J.A. 1666. After this one conversation, which occurred prior to Gray's indictment, Worthington never again talked with Gray about investigating mental health evidence. Gray's friends continued to describe him as irrational and "damaged emotionally." J.A. 884. Gray was suffering from anxiety attacks, and on January 22, 1993, he had another fainting spell. He was temporarily transferred to a state prison, and when he was returned to the county jail on January 27, he was assigned to the juvenile cellblock, where Worthington requested that he be kept "[d]ue to his physical and mental condition." J.A. 263.

On April 6, 1993, at Worthington's suggestion, Gray retained a second lawyer, Dal Wooten, to assist in his defense. Like Worthington, Wooten had never represented a client in a capital case. Wooten read Dr. Lara's report, but he saw nothing in it to indicate that mental health evidence should be considered. Indeed, he and Worthington never discussed with each other the possibility of presenting mental health evidence. On May 10, 1993, Gray was indicted on a charge of first degree murder. That week, Gray placed all of his assets in an irrevocable trust for his children.

On October 12, 1993, about two weeks before Gray's trial began, Worthington was shot and wounded in the shoulder by his wife during a domestic dispute. The police charged Mrs. Worthington with assault with a deadly weapon with intent to kill, inflicting serious injury. Worthington was treated at a local hospital, and his shooting and Gray's case were linked in media coverage. Worthington told Gray that his (Worthington's) shooting was an accident, and Gray consented to Worthington's continuing representation.

Defense counsel relied on Gray's dubious alibi for eleven months. Then, nine days before trial, on October 22, 1993, Gray admitted to his lawyers that Mrs. Gray was shot during the altercation in the

driveway. Gray's trial began on November 1, 1993. In the guilt phase the state presented evidence about Gray's false alibi and evidence that he had physically and psychologically abused Mrs. Gray both before and after the separation. There was eyewitness testimony about the driveway altercation that ended with Mrs. Gray's death. The state's forensic pathologist testified that Mrs. Gray died from a bullet wound to the head, that a pair of marks on her face could have come from contact with a stun gun, and that a blunt force injury to her face was consistent with a blow from the butt end of a handgun. Gray testified in his own defense. He said that Mrs. Gray pointed a pistol at him and, when he pushed it away, it discharged, striking her in the head. Gray said he lied to the police about being in the bathtub because he did not think anyone would believe the truth. The defense presented no mental health evidence. The jury convicted Gray of first degree murder.

When the case reached the sentencing phase on December 14, 1993, the presentation of evidence took less than a day. The state offered one witness in its direct case: a court clerk testified that, at the time of Mrs. Gray's death, Gray was subject to four outstanding misdemeanor warrants — obtained by Mrs. Gray on June 26, 1992 — for attempted assault with a deadly weapon, communicating threats, assault on a female, and false imprisonment. A recreation director testified in rebuttal that Gray was once removed as a Little League coach because he yelled at the players. The defense presented six character witnesses. Gray's son testified that he was a good, dedicated, and involved father. Another witness testified on direct that Gray was a committed and supportive husband and on cross that Gray was distraught by his separation from Mrs. Gray and his efforts to manage a household. Others testified that Gray was a good son to his ailing mother and a committed Little League coach. Again, Gray's counsel introduced no mental health evidence through either lay or expert testimony.

The jury recommended a death sentence on the basis of three aggravating factors: (1) the murder was especially heinous, atrocious, or cruel; (2) it was committed to disrupt or hinder a governmental function (a court order compelling discovery in the divorce case); and (3) it was committed because of Mrs. Gray's exercise of her official duty as a witness (swearing out warrants against Gray and being a

potential witness with respect to the charges). *See* N.C. Gen. Stat.
§ 15A-2000(e)(7), (e)(8), and (e)(9). The jury unanimously rejected
two mitigating factors relating to mental health: that the offense was
committed while Gray was under the influence of mental or emotional
disturbance and that Gray's capacity to conform his conduct to the
requirements of law was impaired. *See id.* § 15A-2000(f)(2) & (f)(6).
Gray was sentenced to death.

After sentencing the trial court found Gray to be indigent and
appointed new lawyers for his appeal. The Supreme Court of North
Carolina affirmed Gray's conviction and sentence, *State v. Gray*, 491
S.E.2d 538 (1997), and the U.S. Supreme Court denied certiorari,
*Gray v. North Carolina*, 523 U.S. 1031 (1998). Gray filed a motion
for appropriate relief (MAR) in the North Carolina trial court, alleg-
ing various claims of ineffective assistance of trial counsel, conflict
of interest on the part of trial counsel, and ineffective assistance of
appellate counsel. In particular, Gray alleged that his trial counsel
were ineffective in failing to engage an expert to assist in investigat-
ing, developing, and presenting mental health evidence in mitigation
at sentencing. At the MAR hearing Gray introduced the testimony and
affidavit of psychiatrist James Bellard, M.D. Dr. Bellard, who inter-
viewed Gray twice in January 1999 and reviewed excerpts of the trial
record, testified that at the time of the offense Gray had a paranoid
personality disorder with a severity of eight on a scale of one to ten.
According to Dr. Bellard, Gray was in considerable emotional distress
at the time, and his ability to function was impaired by his personality
disorder and exacerbated by the stress of his marital discord. Dr. Bel-
lard opined that, while Gray could conform his conduct to the require-
ments of law, his capacity to do so was significantly impaired. The
MAR court denied relief on December 1, 2000, and the Supreme
Court of North Carolina later denied certiorari.

Next, in May 2002 Gray filed a petition for a writ of habeas corpus
in U.S. district court. Two years later Gray amended his petition to
include additional claims. The district court granted the state's motion
for summary judgment, rejecting Gray's initial claims on the merits
and his amendments on statute of limitations grounds under the
Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28
U.S.C. § 2244(d)(1). Gray appeals the district court's order, arguing
that the writ should have been awarded on two bases: the ineffective

assistance of trial counsel in failing to investigate and develop, for sentencing purposes, evidence of Gray's mental impairment, and lead counsel's failure to withdraw as a result of a conflict of interest (Worthington was a potential witness). Gray also argues that the writ should have been granted on two claims (asserted by amendment) that the district court rejected as time barred: that Worthington labored under a conflict because of his wife's prosecution for domestic assault by the same authorities prosecuting Gray, and that trial counsel were ineffective in failing to present a forensic pathologist for the defense. Certificates of appealability were granted on these issues.

## II.

Our review is *de novo* when a district court's decision on a petition for a writ of habeas corpus is based on the state court record. *Williams v. Ozmint*, 494 F.3d 478, 483 (4th Cir. 2007). According to AEDPA, a federal court should not grant habeas relief on any claim adjudicated on the merits in state court unless the adjudication resulted in a decision that (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States;" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). As the Supreme Court explained in *Williams v. Taylor*:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law . . . . Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

529 U.S. 362, 412-13 (2000). State court factual determinations are presumed to be correct and may be rebutted only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

## III.

Gray contends first that he was denied his Sixth Amendment right to counsel because his lawyers failed to investigate and develop (for

sentencing) mitigating evidence about his impaired mental condition at the time of the offense. To prevail on an ineffective assistance claim, a petitioner must establish (1) that counsel's performance was deficient and (2) that the deficiency prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). We conclude, as explained below, that the North Carolina MAR court engaged in an unreasonable application of Supreme Court precedent concerning both of *Strickland*'s components. Furthermore, in assessing prejudice, the MAR court held Gray to an inappropriately high standard of proof that was contrary to Strickland's standard of a "reasonable probability" of a different result. *See id.* at 694; 28 U.S.C. § 2254(d). An objectively reasonable application of *Strickland* principles compels the conclusion that Gray's lawyers were prejudicially ineffective in their failure to investigate and develop, for sentencing purposes, evidence of Gray's impaired mental condition.

A.

To establish deficient performance under *Strickland*, a petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. The performance of counsel is measured in terms of "reasonableness under prevailing professional norms." *Id.* at 688. Our evaluation of performance "must be highly deferential," judged "on the facts of the particular case," and considered "from counsel's perspective at the time." *Id.* 689, 690. The performance inquiry in this case centers on the nature of counsel's duty to investigate mitigating evidence for sentencing in a capital case. *Strickland* does not require defense counsel to "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins v. Smith*, 539 U.S. 510, 533 (2003) (citing *Strickland*, 466 U.S. at 689). Instead, it imposes upon counsel "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691; *see Wiggins*, 539 U.S. at 533.

"Prevailing norms of practice as reflected in the American Bar Association standards and the like are guides to determining what is reasonable, but they are only guides." *Stickland*, 466 U.S. at 688 (citation omitted); *see also Meyer v. Branker*, 506 F.3d 358, 372 (4th Cir.

2007) (noting that although the ABA Guidelines can be relevant "in determining what constitutes reasonable performance in a capital trial, they certainly cannot be dispositive in and of themselves" (citations omitted)). According to the Supreme Court, it was a "well-defined norm[ ]" at the time of Gray's trial that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence.'" *Wiggins*, 539 U.S. at 524 (quoting American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1.C (1989) (ABA Guidelines)). The ABA Guidelines suggested that one avenue of investigation that counsel should consider is the condition of the defendant's mental health. ABA Guidelines 11.8.3.F.2, 11.8.6.B. The Guidelines also advised that "[t]he assistance of one or more experts (*e.g.*, social worker, psychologist, psychiatrist, investigator, etc.)" in the investigation, development, and presentation of relevant mitigating evidence "may be determinative as to [the] outcome" at sentencing. ABA Guideline 11.8.6 cmt.; *see also id.* 1.1 cmt., 5.1.1.A.v, 11.4.1. Counsel's "strategic choices made after thorough investigation . . . are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. In evaluating an ineffective assistance claim, a court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690.

The critical question here is whether Gray exhibited signs of mental and emotional instability that made it essential for his counsel to investigate for evidence of mental impairment. In concluding that Gray did not establish that his counsel performed in a deficient manner, the MAR court failed to consider the reasonableness of counsel's actual performance under prevailing professional norms, which include the duty to make considered decisions about areas of potential investigation, as *Strickland* requires. *See* 466 U.S. at 688, 690-91. The MAR court thus arrived at its determination through an unreasonable application of *Strickland*.

1.

Gray's counsel were confronted repeatedly with indications of Gray's mental impairment. Nevertheless, without making reasoned

strategic decisions, counsel ignored these red flags and failed to investigate for mental health evidence or consider introducing evidence on that issue. *See Rompilla v. Beard*, 545 U.S. 374, 392 (2005). To begin with, the Gray divorce file, handed to Worthington just days before he assumed the representation of Gray in the murder case, contained two affidavits from professionals who warned explicitly about Gray's mental instability: Dr. Barker described Gray as suffering from behavior aberration and a psychological problem; a marriage counselor stated that she withdrew her services because she was alarmed by Gray's challenging and confrontational conduct. Likewise, the investigation that defense counsel did conduct led to statements by Gray's friends and associates that prior to the offense he was "very disturbed," "very agitated," not "in his right mind," and "distraught" over the breakup of his marriage. J.A. 822, 782, 802, 1292. After the offense Gray's jailers placed him under suicide watch, observing that he was very depressed and having anxiety attacks and fainting spells; a friend who telephoned Gray while he was incarcerated said he was "not . . . one hundred percent rational." J.A. 884. Finally, Dr. Lara, a psychiatrist, diagnosed Gray with a psychiatric impairment, stating that he suffered from "regression in behavior and reductions in impulse control" at the time of the offense. J.A. 45. Dr. Lara recommended further evaluation of Gray's mental condition at the time of the offense and offered additional assistance in that regard.

Despite the many indications of Gray's mental impairment and the well-marked paths to the development of evidence about the impairment, Worthington had only one conversation with Gray about pursuing mental health evidence through an independent psychiatrist. Gray responded that he did not want to spend more money on the case and that he did not need a psychiatrist (Dr. Lara had also recommended that Gray undergo psychiatric counseling). This conversation occurred prior to indictment and long before Gray or his lawyers knew that he would be tried for a capital offense, yet Worthington never again raised the subject of mental health evidence with Gray. After Wooten, the second lawyer, came into the case, he looked at Dr. Lara's report, but failed to see any need to investigate for evidence of mental impairment. Gray's two lawyers never once discussed with each other the advisability of exploring the need for mental health testimony from an expert.

Defense counsel should not have dispensed with a mental health investigation just because Gray did not want to hire an independent psychiatrist at the pre-indictment stage, well before the state announced its intention to seek the death penalty. *See* ABA Guideline 11.4.1.C ("The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered."). Defense counsel had an offer of mental health investigation assistance from Dr. Lara, and that assistance was available free of charge.[1] Dr. Lara said that if he was provided further information about Gray's behavior and functioning prior to the offense, he would endeavor to make a more definitive diagnosis of Gray's mental condition at the time of the offense. Defense counsel completely ignored Dr. Lara's offer, despite the fact that the information specified and sought by Dr. Lara was at their fingertips. Nor did counsel seek court approval to hire an independent psychiatrist at state expense when Gray became indigent shortly after his indictment. Finally, counsel failed to consider the issue of mental health evidence even after the jury returned a guilty verdict and Gray faced the certainty of a capital sentencing proceeding.

Counsel's failure to conduct an investigation into mental health evidence was not the result of "reasonable professional judgments." *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 534; *see also Meyer*, 506 F.3d at 372. There was simply no consideration of whether a defense based on psychiatric evidence might be a strategy worth exploring. It was the chief jailer, and not Worthington, who first suggested that Gray undergo a competency evaluation. Moreover, counsel pursued a questionable alibi theory until days before trial, completely ignoring an avenue of investigation (potential mental

---

[1]Contrary to the dissent's assertion, *see post* at 37 n.5, the MAR record supports the statement that Dr. Lara would have supplemented his evaluation at no cost to Gray. As Dr. Lara's report reveals, he was employed as a forensic psychiatrist at the pretrial detention center at Dorothea Dix Hospital, a state psychiatric facility operated by the Secretary of the North Carolina Department of Health and Human Services. *See* N.C. Gen. Stat. Ann. § 122C-181. Moreover, even assuming that Dorothea Dix would have charged for the additional services volunteered by Dr. Lara, Gray's counsel could have moved for further evaluation at state expense once Gray became indigent.

health evidence) that held promise, according to Dr. Lara's report. There is no indication that Worthington and Wooten, who had no experience whatsoever in capital litigation, understood that such evidence can be an important factor in a jury's decision at sentencing. In short, counsel's failure to investigate and develop evidence of Gray's mental impairment was not a carefully considered strategic choice.

The MAR court's conclusion that Gray failed to satisfy *Strickland*'s deficient performance component was based on several erroneous determinations. The court concluded that the accident defense adopted at the last minute by Gray's lawyers was inconsistent with a defense of diminished mental responsibility. This conclusion fails to consider that Gray's "counsel were not in a position to make [an informed] strategic choice" about what defense theory or theories to pursue because they had failed to undertake a reasonable investigation *before* making that choice. *Wiggins*, 539 U.S. at 536. Moreover, common sense dictates that an accident defense and an impaired mental capacity defense would have been compatible in Gray's case. Pursuit of the two theories would have paved the way for the obvious argument that Gray's mental illness led to his altercation with Mrs. Gray in the driveway, which, in turn, led to her accidental shooting. The MAR court also discounted the testimony of Dr. Bellard and, in doing so, overlooked a basic lesson from that testimony: a reasonable investigation by counsel could have led to the development of mental health evidence, such as the expert opinion offered by Dr. Bellard, and that evidence would have been admissible in mitigation at sentencing.

Finally, the MAR court relied heavily on Gray's one-time refusal to hire an independent psychiatrist. This reliance was unreasonable for several reasons. First, as discussed above, Gray's statement came quite early in the proceedings, before he knew that he was facing the potential of a death sentence. Even when the stakes were raised to the level of life or death, counsel did not revisit the mental health evidence issue, either between themselves or with Gray. Second, a reasonable lawyer would not rely on his client's self-assessment of his mental health, especially in a capital case. There was an independent duty to investigate. Third, the MAR court found that *Strickland*'s first element was not satisfied specifically because Gray was not indigent

and had not authorized funds for an independent psychiatric examination. Gray has rebutted this finding by clear and convincing evidence that he was in fact indigent at the time of trial, having placed all of his assets in an irrevocable trust for his children six months earlier. As the Supreme Court has said, the state court's "partial reliance on an erroneous factual finding further highlights the unreasonableness of [its] decision." *Wiggins*, 539 U.S. at 528. Fourth, regardless of Gray's financial status, further psychiatric evaluation could have been obtained from Dr. Lara free of charge.

In arguing that Gray's refusal to spend his own funds for a psychiatric evaluation ended his counsel's responsibility to investigate for mental health evidence, the state urges us to extend the Supreme Court's recent ruling in *Schriro v. Landrigan*, 127 S. Ct. 1933 (2007). *Schriro* holds that when a defendant "inform[ed] the [trial] court [during the sentencing hearing] that he did not want mitigating evidence presented," a reviewing court could reasonably conclude that counsel was not required to present such evidence against his client's clear directive. *Id.* at 1942. The Court was careful to distinguish the circumstances in *Schriro* from those in *Rompilla*, where the Court found ineffective assistance of counsel when "the defendant refused to assist in the development of a mitigation case, but did not inform the court that he did not want mitigating evidence presented." *Id.* (citing *Rompilla*, 545 U.S. at 381). In *Schriro* the Court thus reaffirmed the Court's earlier holdings that counsel has an affirmative duty to investigate for mitigating evidence when preparing for sentencing. *See Rompilla*, 545 U.S. at 381; *Wiggins*, 539 U.S. at 523. Here, Gray, displaying an attitude of noncooperation similar to that of the petitioner in *Rompilla*, made a statement to one of his lawyers very early in the case indicating that he did not wish to spend his money on a psychiatrist. Nothing in *Schriro* permits Gray's statement to be used to relieve his counsel of their duty to investigate for mitigating mental health evidence.

As we have already emphasized, prior to their representation of Gray neither Worthington nor Wooten had ever represented a client facing the death penalty. There is no indication that either understood that expert mental health evidence could be critical to the jury's decision on sentencing. There is no indication that either understood his duty, in light of the circumstances in Gray's case, to make a thorough

investigation into Gray's mental health and to consider introducing expert evidence on that subject. Gray's lawyers simply missed or ignored — and failed to act on — the many signs that Gray was mentally and emotionally unstable. Because their failure to investigate in this area was unreasonable under prevailing professional norms, Gray has established *Strickland*'s element of deficient performance.

2.

The dissent's attacks on our conclusion that Gray's counsel were ineffective in failing to investigate Gray's mental health can be boiled down to two, and both miss the mark.

First, the dissent claims that we take "liberties . . . with the facts," "spin" the facts, and "mischaracterize[ ] record evidence" in concluding that there were sufficient signs to alert Gray's counsel to the need for an investigation into Gray's mental health. *Post* at 31, 33 n.1, 31; *see also post* at 32 (speaking of the "contrived nature of the majority's [factual] support"). No spin or mischaracterization is necessary to establish that Gray's counsel had sufficient notice. The dissent begins its efforts to discount the signs of Gray's mental instability by launching an extended attack on the divorce proceeding affidavits of Dr. Barker (Mrs. Gray's gynecologist) and Marilyn Huber (the Grays' marital counselor). The dissent argues that these affidavits did not establish that Gray "suffer[ed] from a diagnosable mental illness" or that Gray's mental health was worthy of investigation, *post* at 50, 38, but that is not our point. The point is that the affidavits, which Worthington had at the outset, were the first of many indications of Gray's mental or emotional disturbance. The affidavits revealed that Gray had a psychological problem and engaged in aberrant, challenging, and confrontational behavior. Much more information about Gray's irrational and disturbed behavior was reported to defense counsel by Gray's friends, associates, and jailers, as we have already recounted. Most important, Dr. Lara, the state psychiatrist, diagnosed Gray with a mental disorder and reported that Gray may have been suffering from regression in behavior and reduced impulse control at the time of the offense, but Dr. Lara indicated that he did not have sufficient information about Gray's behavior and condition prior to the offense to make a complete assessment. Dr. Lara offered to expand his opin-

ion about Gray's mental condition at the time of the offense, if additional information was provided.

The dissent continues its first line of attack by claiming that the record reveals the "substantive weakness of [the] purported evidence of Gray's psychiatric impairment *prior to* the murder." *Post* at 35 (emphasis added and internal quotation marks omitted). However, the dissent later reverses itself, stating that "[a] number of lay witnesses" testified that Gray was "under significant stress and acting out of character at the time of the murder." *Post* at 45 (emphasis omitted). This testimony, such as it was, confirms that Gray's counsel had access to credible evidence that Gray suffered from a mental disturbance before the offense.[2] The post-arrest observations of Gray's jailers, friends, and counsel only serve as additional indications that Gray suffered from a preexisting mental or emotional impairment that warranted investigation, including evaluation by a mental health expert. In sum, the notice to counsel about the issue of Gray's mental condition was nothing short of glaring.

Second, the dissent contends that we, "with the benefit of hindsight, discard the high degree of deference owed to defense counsel's strategic choices, and replace it with an attempt to mandate that sentencing strategies in death penalty cases always include presentation of *expert* mental health testimony." *Post* at 46. The dissent misstates our position, for we do not (and could not) impose any blanket strategy requirement upon defense counsel. We simply recognize the inescapable fact that defense counsel made *no* strategic choices about whether to introduce mental health evidence because they failed to undertake a reasonable investigation in that area, notwithstanding the clear indications that such an investigation was warranted. Of course, defense counsel need not investigate for evidence of mental impairment in a case where the circumstances indicate that such an investigation would not be worthwhile. But here, as we have explained, there were multiple indications that Gray suffered from a mental

---

[2]As we explain later, the scattered trial testimony about Gray's mental state was not part of a considered mitigation strategy by Gray's counsel that centered on his mental impairment. *See infra* at 25-26. Indeed, much of this testimony was elicited by the prosecution during the guilt phase.

impairment. *See supra* at 11-14. Gray's counsel simply ignored, or failed to appreciate the significance of, these leads.

Instead of pursuing the futile argument that Gray's counsel undertook a reasonable *investigation*, the dissent contends that we err by failing to defer to counsel's mitigation strategy for sentencing. Of course, even the dissent's attempts to put a better gloss on defense counsel's inadequate strategy cannot rectify the central problem. Counsel's failure to investigate Gray's mental health made it impossible for them to adopt a reasonably informed strategy. The failure to investigate cannot be justified. Gray's counsel never discussed or considered an investigation into Gray's mental condition during the development of Gray's mitigation case. Thus, counsel's inaction was not based on a "reasonable professional judgment[ ]" that a mental health investigation was unwarranted. *Strickland*, 466 U.S. at 691. And, despite the dissent's assertions, the failure to investigate was not a part of any reasoned defense strategy. *See Meyer*, 506 F.3d at 370-72 (holding that counsel's performance was reasonable when he chose not to introduce mental health evidence for strategic reasons after a thorough investigation). We have no "preferred strategy" that we are attempting to impose on counsel, as the dissent charges. *Post* at 46; *see also id.* (referring to "[t]he majority's preferred strategy, concocted with the benefit of hindsight"). Nor do we adopt "a *per se* rule requir[ing] the presentment of expert mental health mitigation evidence." *Id.* at 46. Instead, we simply adhere to Supreme Court precedent and require that counsel, before settling on a sentencing strategy, make "efforts to discover *all reasonably available* mitigating evidence." *Wiggins*, 539 U.S. at 524 (internal quotation marks omitted); *see Strickland*, 466 U.S. at 690-91. Because Gray's counsel ignored numerous red flags and failed to investigate reasonably available mitigating evidence about Gray's mental impairment, we conclude that their performance was constitutionally deficient, and the state MAR court's finding to the contrary was an unreasonable application of *Strickland*.

## B.

To establish *Strickland*'s second element, a petitioner must show a "reasonable probability" that counsel's deficient performance prejudiced the outcome of the case. 466 U.S. at 694. "A reasonable proba-

bility is a probability sufficient to undermine confidence in the outcome." *Id.* In a case where counsel fails to properly investigate and develop mitigating evidence for sentencing, prejudice occurs when "the likelihood of a different result if the [missing] evidence had gone in is 'sufficient to undermine confidence in the outcome' actually reached at sentencing." *Rompilla*, 545 U.S. at 393 (quoting *Strickland*, 466 U.S. at 694). The state MAR court also erred in concluding that Gray failed to satisfy *Strickland*'s prejudice requirement.

1.

In determining that counsel's performance did not cause prejudice in the sentencing phase, the MAR court held: "Even with the proffered medical testimony this Court finds it to be a leap of speculation that the jury would *necessarily* have found the existence of the statutory and nonstatutory mitigating circumstances." J.A. 1566 (emphasis added). The MAR court required *certainty* that the jury would have reached a different result at sentencing. This standard is more onerous than either the preponderance of the evidence standard rejected as too demanding by the Supreme Court in *Strickland* or the one actually adopted there. Under *Strickland* Gray is simply required to show that there is a "reasonable probability" that the missing evidence would have led the jury to "conclude[ ] that the balance of aggravating and mitigating circumstances did not warrant death." 466 U.S. at 695; *see also Woodford v. Viscotti*, 537 U.S. 19, 22-24 (2002).

Putting aside the MAR court's use of a standard that is contrary to *Strickland*, we hold that the state court's decision was an unreasonable application of the proper standard. *See* 28 U.S.C. § 2254(d). The MAR court made the very error the Supreme Court counseled against in *Williams*: "[The state court's] prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence . . . [or] reweigh[ ] it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98; *see Strickland*, 466 U.S. at 695-96. The MAR court here rested its lack of prejudice determination on two findings: that the trial court submitted the mental health mitigating factors to the jury and that the state presented lay evidence that Gray did not suffer from mental impairment. However, in reaching its conclusion, the MAR court failed entirely to mention any of the mitigating evidence presented at trial, *see Williams*, 529 U.S. at

398, and improperly discounted the mitigation evidence that could have been introduced at sentencing. Further, the MAR court did not even attempt to evaluate the relative strength of the competing evidence. Because the MAR court unreasonably failed to apply the test for prejudice established by Supreme Court precedent, we must weigh the evidence of mitigation against the state's evidence of aggravation to determine whether Gray was prejudiced by his counsel's constitutionally deficient performance. Our own examination of the record persuades us that prejudice did result.

At sentencing the jury found thirteen of the twenty-one mitigating factors proffered. The jury, among the factors, determined that Gray was a loving and dedicated father, son, and provider; that he contributed to the community as a Little League coach; that he was law abiding and posed no threat for forty-two years; that he cooperated with law enforcement; that Mrs. Gray's death was quick; and that Gray exhibited good behavior in jail. The jury, however, failed to find the two mental health mitigating factors, that Gray was under the influence of mental or emotional disturbance at the time of the offense and that his capacity to conform his conduct to the requirements of the law was impaired. In light of defense counsel's lack of focus on these factors, it is not surprising that the jury did not adopt them. Counsel did not present a cohesive case for the mental or emotional disturbance factor — indeed, it was barely mentioned in closing argument at sentencing. Worthington testified at the MAR hearing that he could not recall introducing any evidence whatsoever to support the second mental health mitigator, which was submitted solely at the instance of the trial judge.

At the MAR hearing Gray's expert on the practice of criminal law testified that "a medical witness is the most important thing you can have to support those two [mental health] mitigating factors." J.A. 1627. Evidence of mental disturbance of the type omitted at Gray's sentencing can be persuasive mitigating evidence for jurors considering the death penalty, and this evidence can determine the outcome. *See, e.g.*, *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004); ABA Guideline 5.1 cmt., 8.1 cmt., 11.8.6 cmt.; ABA Guideline 4.1 cmt. (rev. ed. 2003); Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538, 1559, 1564-65 (1998). In comparison to the other mitigating factors

submitted for the jury's consideration in this case (such as that Gray "was a good and loving son," J.A. 740), the two mental health mitigating factors — largely ignored by defense counsel — were Gray's best hope of convincing the jury that he did not deserve the death penalty. The missing expert evidence on Gray's impaired mental condition would have provided the essential support for these factors.

We need not speculate about whether expert evidence would have been available if Gray's lawyers had fulfilled their duty to investigate. The lawyers had in their possession Dr. Lara's report diagnosing Gray with a mental disorder, specifically, "adjustment disorder with mixed disturbance of emotions and conduct," together with "reductions in impulse control." J.A. 45. If the lawyers had decided that Dr. Lara's initial diagnosis needed to be supplemented, he had offered to do just that. Yet Dr. Lara was not called as a witness in mitigation. In addition, counsel could have introduced expert testimony such as that of Dr. Bellard, who diagnosed Gray as having "paranoid personality disorder" and "adjustment disorder." J.A. 1743. The jury would have heard from such an expert that Gray had a severe mental illness, and that his ability to conform his conduct to the requirements of the law was "significantly impaired" at the time of the offense. J.A. 1744. The jury would have heard testimony that "if [Gray] had not had paranoid personality disorder, he would have been more likely to deal in a rational and calm manner with the problems that were facing his family." *Id.* It would have learned that Gray's disorder made him irrationally mistrusting and "quick to counterattack," and that individuals with his disorder are prone to "psychotic episodes" when they are under severe stressors such as those faced by Gray at the time of the offense. J.A. 278-79.

This expert evidence, which was missing entirely, would have provided the jury with a medical explanation for Gray's compulsive behavior and his inability to control his reactions. The jury would have known that he suffered from a severe mental illness. In short, this evidence would have provided direct support for the two mental health mitigating factors. Given the significance of the mental health evidence, there is a reasonable probability that a competent lawyer would have introduced it at sentencing. It would have revealed no additional negative factors to the jury and would have had virtually no downside for defense strategy. *See Wiggins*, 539 U.S. at 535. Spe-

cifically, evidence of Gray's mental impairment would not have con-
flicted with the mitigation strategy pursued by the defense, which was
essentially that Gray was a good father, son, and community member.
*Id.* The mental health evidence would surely have provided a signifi-
cant boost to Gray's mitigation case.

Nonetheless, the MAR court discounted Dr. Bellard's opinion, not-
ing that (1) "Dr. Bellard's contact with defendant was six years after
the murder" and (2) Dr. Bellard "had not reviewed the trial testimony
. . . [which] is important to making the diagnosis arrived at by Dr.
Bellard . . . [as] noted by the manual Dr. Bellard himself utilizes."
J.A. 1562. The MAR court's reasoning is objectively unreasonable.
First, Gray was forced to rely on Dr. Bellard's examination six years
after the offense precisely because of the deficient performance of
Gray's counsel. In this circumstance, the rejection of Dr. Bellard's
testimony because it was obtained belatedly would place Gray in an
impossible position by prohibiting him from presenting evidence to
rectify his counsel's constitutional deficiency. Such an approach
would directly contravene the uncontroversial requirement that a
court assessing prejudice under *Strickland* must consider admissible
"mitigation evidence developed in postconviction proceedings." *Wil-
liams*, 529 U.S. at 398. Second, in suggesting that Dr. Bellard disre-
garded professional standards by failing to review "the trial testimony
which set forth defendant's actions and conduct in the days and
months leading up to the murder of Rosalyn Gray," J.A. 1562, the
MAR court drastically mischaracterized the diagnostic requirements
of the DSM-IV (the manual used by Dr. Bellard) as well as Dr. Bel-
lard's testimony. The DSM-IV diagnostic criteria focuses solely on
the patient's own behaviors; it nowhere states, as the MAR court
asserted, that interviewing other individuals "is important to making
the diagnosis." J.A. 1562. The only support for the MAR court's con-
clusion is Dr. Bellard's testimony that "all information would be help-
ful" in making a diagnosis. J.A. 1753. In fact, Dr. Bellard — who had
fourteen years' experience as a clinical psychiatrist — *did* review the
trial testimony of a witness, Dr. Gregory Gridley, who counseled
Gray's son and interacted with the Grays socially prior to the crime.
In addition, Dr. Bellard conducted a thorough examination of Gray on
two occasions (finding no evidence of malingering), reviewed Gray's
trial testimony, reviewed the affidavits from Dr. Barker and Huber,
and attempted to contact another witness by telephone, all before

diagnosing Gray with paranoid personality disorder. Thus, clear and convincing evidence rebuts any conclusion or finding by the MAR court that the DSM-IV required Dr. Bellard to read the entire trial record or interview individuals from Gray's past prior to making a diagnosis. In sum, the MAR court's dismissal of Dr. Ballard's testimony was objectively unreasonable.

Dr. Bellard's testimony about Gray's psychiatric disorders (paranoid personality disorder and adjustment disorder) would have provided the sentencing jury with compelling support for the two mental health mitigating factors and, equally important, an explanation for Gray's aberrant behavior. Gray's entire mitigation case — with the missing expert mental health evidence included and emphasized — is thus quite powerful. We must determine, however, whether there is a reasonable probability that it would have outweighed the state's evidence in support of the death penalty. *See Strickland*, 466 U.S. at 695. The weighing process to determine the prejudice question is demanding and requires objectivity. Following the Supreme Court's approach, we can say at the outset that the state's evidence in support of the death penalty is far weaker than it was in the *Williams v. Taylor* case, 539 U.S. 510, where the Court found prejudice as a result of counsel's failure to investigate and present mitigating evidence. *See Wiggins*, 539 U.S. at 537 (noting that the petitioner in *Williams* "had savagely beaten an elderly woman, stolen two cars, set fire to a home, stabbed a man during a robbery, and confessed to choking two inmates and breaking a fellow prisoner's jaw").

The state presented only one witness in its direct case at Gray's sentencing hearing, the court clerk who testified that Mrs. Gray had sworn out four misdemeanor warrants against Gray with a hearing date scheduled for early December 1992. The state otherwise relied on evidence from the guilt phase to support the three aggravating factors found by the jury. The state's evidence to support the first factor, that the murder was committed "to disrupt or hinder the exercise of a governmental function," was based on Gray's failure to meet discovery deadlines in the divorce case, which had prompted a court order directing him to respond. The second aggravating factor, that the crime was committed to interfere with Mrs. Gray's "exercise of her official duty as a witness" was based on the fact that Mrs. Gray had sworn out misdemeanor warrants against Gray on June 26, 1992,

and that a trial was scheduled on those charges. The final factor, that the "murder [was] especially heinous, atrocious or cruel," was supported by testimony that Gray had assaulted Mrs. Gray on at least one prior occasion and that he had struggled with her before her death, inflicting noticeable marks or injuries. In addition, as the MAR court observed, the jury heard testimony from lay witnesses that Gray was "in full control of his mental faculties" at the time of the crime. J.A. 1566. These witnesses admitted, however, that Gray's behavior was erratic and overly emotional.

The jury did not have the opportunity to weigh the aggravating factors and adverse lay testimony against the powerful expert mental health evidence that could have been placed in the balance with the thirteen mitigating factors that were established. The evidence of Gray's serious mental illness would have given the jury the full picture of Gray and his crime, including the fact that he was acting under a severe mental or emotional disturbance and with impaired capacity when he killed his wife.

We have reviewed the evidence on both sides, and we conclude that "had the jury been able to place [Gray's mental disturbance] on the mitigating side of the scale, there is a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537. There is, in other words, "a reasonable probability that [the jury] would have returned with a different sentence." *Id.* at 536. Gray has therefore established prejudice as a result of his counsel's inadequate performance with respect to sentencing, and a new sentencing hearing is warranted.

2.

The dissent acknowledges, as it must, that the MAR court "fail[ed] to engage in an explicit reweighing of all available mitigating evidence." *Post* at 48. Nonetheless, the dissent attacks our reasoning on several grounds, constructing its own arguments rather than relying on the MAR court's analysis. First, and foremost, the dissent declares that the MAR court made no legal error in avoiding the reweighing process because such an attempt would have been "farcical" after it found the testimony of Dr. Bellard to be "unpersuasive." *Id.* As we have explained, the MAR court's bases for discounting Dr. Bellard's

opinion were objectively unreasonable. *See supra* at 22-23. Moreover, regardless of the MAR court's assessment of Dr. Bellard's opinion, the court erred in its application of *Strickland* and *Williams* by failing to reweigh the totality of the evidence. Instead, its prejudice determination consists of a single, conclusory sentence. The Supreme Court makes clear that, in assessing prejudice, a state court may not simply draw a conclusion with no reviewable reasoning. Instead, the Court has repeatedly emphasized that it is essential that a court "evaluate the totality of the available mitigation evidence — both that adduced at trial, and the evidence adduced in the habeas proceeding — in reweighing it against the evidence in aggravation." *Williams*, 529 U.S. at 397-98. Because mental health testimony was not presented at trial and was properly presented to the MAR court, the MAR court unreasonably applied Supreme Court precedent by failing to reweigh the evidence. *See id.*

Second, in a further sign that the dissent finds no support in the MAR court's analysis, the dissent argues that we "fail[ ] to recognize the centrality of . . . abundant *lay* witness testimony to defense counsel's mitigation theory," which "focus[ed] on Gray's mental and emotional stress." *Post* at 50. The dissent is mistaken. The record reveals that Gray's counsel did not present (or attempt to present) *any* evidence at sentencing that Gray suffered from a mental impairment. As we have discussed above, Gray's counsel neither investigated, nor adopted a strategy relating to, Gray's mental health. Worthington's admissions at the MAR hearing directly contradict the dissent's characterization of lay mental health testimony as "abundant" and "central" to what the dissent claims was a "focused" defense strategy. *Id.* In discussing the mitigating factor that Gray was under the influence of mental or emotional distress, Worthington recalled that the only evidence offered was the "testimony in the trial of . . . a friend of [Gray's] . . . and I'm not for sure, I think that [Gray] testified that he was under emotional distress." J.A. 1658-59. Worthington could not recall offering any evidence in support of the mitigating factor that Gray's capacity to conform his conduct to the law was impaired.

Although Gray's counsel admitted to eliciting only limited testimony about Gray's emotional distress, some witnesses nonetheless mentioned his instability. Much of this testimony, however, was in response to questioning by the prosecution, not Gray's counsel. The

trial court recognized that there was limited evidence about Gray's mental state, but it allowed the mental distress mitigating factor to be submitted to the jury "out of an abundance of caution." J.A. 1366. Worthington made a passing (two-sentence) mention of only one of the mental health mitigators in his closing argument, stating: "You heard Charles Buchanan, a life-long friend talk about Mr. Gray's mother, and this is the mitigating factor, the felony was committed while the defendant was under the influence of mental or emotional distress. The mother hospitalized and he was distressed during the month of November." J.A. 1430-31. In sum, the dissent is wrong to say that there was "abundant lay testimony" about Gray's mental health. More important, there is no support for the argument that Gray's counsel adopted or pursued a mitigation theory related to Gray's mental impairment.

Third, the dissent argues that any expert mental health testimony would have been double-edged. In reaching this conclusion, the dissent relies on Dr. Lara's report and fails to recognize the obvious implications of Gray's counsel's deficient performance. If Gray's counsel had undertaken a reasonable investigation after reviewing the report, they would have provided Dr. Lara with the additional information he requested for a complete assessment of Gray's mental health at the time of the offense. Dr. Lara's report thus is not an end-point in expert evidence, as the dissent would have it, but a beginning that should have indicated to counsel that further investigation was necessary. A proper investigation and evaluation of Gray's mental health would have provided a diagnosis such as that of Dr. Bellard that could have been introduced at sentencing. There is no double edge to this evidence because Dr. Lara's report explicitly left room for a more informed assessment, and the inclusion of either expert's final opinion would not have undermined Gray's defense strategy. *See Bowie v. Branker*, 512 F.3d 112, 121 (4th Cir. 2008); *Moody*, 408 F.3d at 152.

Finally, the dissent faults us for "cast[ing] aside the MAR court's opinion and conduct[ing our] own analysis," claiming that our "doe-eyed view" of the missing evidence "unsurprisingly" leads us to our "preferred result" (a new sentencing hearing). *Post* at 53, 49, 53. The MAR court, by failing to conduct its own proper analysis, left us with no choice but to undertake our own independent review of the record.

In undertaking that review, we have not, as the dissent freely charges, "manufacture[d] a hypothetical expert super-witness," *post* at 53 n.16, or fashioned a "mitigation case of [our] own making," *id.* at 53. Instead, we have conducted a straightforward and dispassionate review of the record, which includes the evidence developed by Gray's post-conviction counsel and presented to the MAR court. This detailed review, which is set forth above, establishes a reasonable probability that deficient performance by Gray's counsel led to his sentence of death. Because "the likelihood of a different result if the [missing mental health] evidence had gone in is sufficient to undermine confidence in the outcome actually reached at sentencing," *Rompilla*, 545 U.S. at 393, a new sentencing hearing is required.

IV.

Gray also contends that his right to effective counsel was violated because Worthington, his lead counsel, failed to withdraw despite an actual conflict of interest. Gray argues that Worthington should have withdrawn in order to testify as to Gray's plan for complying with court ordered discovery in the divorce proceeding. The Sixth Amendment right to counsel is violated when the defense lawyer has an actual conflict of interest that "adversely affect[s] [the] lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 348 (1980). When this situation occurs, prejudice is presumed. *Id.* at 349-50; *Mickens v. Taylor*, 535 U.S. 162, 173 (2001).

Here, the MAR court applied the *Cuyler v. Sullivan* test, as adopted by the Supreme Court of North Carolina in *State v. Walls*, 463 S.E.2d 738 (N.C. 1995), and concluded that even if there was a conflict of interest, Worthington's failure to withdraw had no adverse effect on his representation of Gray. The court based its conclusion on several findings, including that Worthington was retained as Gray's divorce lawyer only shortly before Gray's arrest for his wife's murder; that when the murder case arose, Worthington had not yet begun working on the divorce case and had no substantive knowledge about it; and that Worthington's testimony about the divorce case would have been duplicative of other defense testimony. Gray has not rebutted any of these findings by clear and convincing evidence, so we presume them to be correct. 28 U.S.C. § 2254(e)(1). The MAR court's decision on this conflict of interest claim did not involve an unreasonable applica-

tion of *Cuyler v. Sullivan*, *see* 28 U.S.C. § 2254(d)(1), and we accordingly reject the claim.

V.

Gray further contends that the district court erred in denying his claim, asserted by amendment to his federal petition, that Worthington labored under a second conflict of interest after he (Worthington) was shot by his wife. The conflict arose, according to Gray, because "Worthington was implicated in the same type of [domestic conflict] as Gray, and [Worthington's] wife was being criminally prosecuted in the same jurisdiction by the same authorities." Appellant's Br. 57. After raising the issue on its own motion, the district court held that this claim is barred by AEDPA's one-year statute of limitations. *See* 28 U.S.C. § 2244(d)(1)(A) (imposing a one-year limitation for filing that runs from "the date on which the [state court] judgment became final by the conclusion of direct review or the expiration of the time for seeking such review"). As part of its ruling, the court determined that the claim, asserted by amendment, could not be saved by relation back to the original petition. Gray argues that the district court erred (1) by improperly raising the limitations issue on its own motion and (2) in concluding that the amendment did not relate back to the original petition. (Gray concedes that if the amendment does not relate back, it is time barred under AEDPA.) We review the district court's determination on these matters for abuse of discretion. *See Day v. McDonough*, 547 U.S. 198, 202 (2006); *United States v. Pittman*, 209 F.3d 314, 316 (4th Cir. 2000).

In *Day v. McDonough* the Supreme Court held that a district court has the discretion, but not the obligation, to consider on its own motion the timeliness of a habeas petition under AEDPA if (1) the parties have fair notice and an opportunity to be heard; (2) the state has not waived the limitations defense; (3) the "petitioner is not significantly prejudiced by the delayed focus on the limitation issue"; and (4) the court "determine[s] whether the interests of justice would be better served by addressing the merits or by dismissing the petition as time barred." 547 U.S. at 209-11 (quotation marks and citations omitted). In this case the district court allowed the parties to be heard, and, after considering each of the preliminary factors listed in *Day*,

concluded that justice would be better served if the court addressed the statute of limitations issue.

The district court then proceeded to consider whether the amendment's claim — that Worthington had another conflict of interest once he was shot by his wife — related back to the original petition. *See* Fed. R. Civ. P. 15(c)(2). An amendment to a habeas petition relates back under Rule 15(c)(2) when the new claim arises from the "same core facts [in time and type] as the timely filed claims." *Mayle v. Felix*, 545 U.S. 644, 657 (2005). Applying this standard, the district court concluded that Gray's amendment did not relate back to the original petition and was therefore time barred.

Gray alleged in his original petition that Worthington was conflicted because of his inability to testify to Gray's intention to comply with the discovery order in his divorce case. In the amendment Gray alleges the facts surrounding Worthington's shooting, but a review of those facts reveals that they support a separate conflict of interest claim. As the district court concluded, although these new facts support the broad contention that Gray was deprived of conflict-free counsel, they arise from an entirely separate factual circumstance and create a new and distinct claim for relief. Because the district court did not abuse its discretion in considering the limitations issue or in concluding that the conflict of interest amendment did not relate back, we affirm the dismissal of this amendment as time barred.

VI.

Gray also contests the district court's dismissal of his amendment adding an ineffective assistance of counsel claim based on counsel's failure to investigate and present expert testimony to rebut the state's forensic evidence with respect to the cause of a blunt force injury to Mrs. Gray's face. The state asserted that this claim was barred by AEDPA's statute of limitations, and the district court held that it did not relate back to the original petition and dismissed it on limitations grounds. Gray concedes that the amendment did not relate back, but argues for the first time on appeal that ineffectiveness of post-conviction counsel constitutes cause for his failure to present this issue in state court and in his original federal habeas petition. This argument is foreclosed by our decision in *Mackall v. Angelone*, 131

F.3d 442 (4th Cir. 1997). In *Mackall* we held that ineffective assistance of counsel in state habeas proceedings does not constitute cause for failure to assert a claim on a timely basis. *Id.* at 449. Gray cannot distinguish his case from *Mackall* because he, like the petitioner in *Mackall*, asserts that his claim would have been raised but for counsel's deficient performance in state post-conviction proceedings. Because *Mackall* controls, we must conclude that the district court properly dismissed Gray's additional ineffective assistance of counsel claim as barred by the statute of limitations.

## VII.

We reverse the judgment of the district court to the extent it denies the writ of habeas corpus to William Robert Gray, Jr., on his claim of ineffective assistance of counsel at the sentencing phase of his case. The remainder of the district court's judgment is affirmed. On remand the district court will grant the writ of habeas corpus unless the State of North Carolina affords Gray a new sentencing hearing within a reasonable time.

*AFFIRMED IN PART,*
*REVERSED IN PART,*
*AND REMANDED*

DUNCAN, Circuit Judge, concurring in part and dissenting in part:

Most habeas petitioners recount, as background to their claims of ineffective assistance of counsel, stories of childhood trauma and horrific mistreatment. Not so here. Petitioner William Robert Gray, a prosperous professional with *retained* counsel, was the abuser, not the abused.

After stalking his estranged wife for months, Gray shot her to death in the driveway of his home as she begged a passerby, "Mister, please don't leave. If you leave, he'll kill me." *State v. Gray*, 491 S.E.2d 538, 544 (N.C. 1997). Gray then entered his home and conscripted his children, ages eight and eleven, in his scheme to lie to authorities about what happened.

Gray promptly retained counsel, to whom he strenuously insisted that he suffered from no psychological infirmities. Counsel nevertheless had Gray committed to Dorothea Dix Hospital for a psychological evaluation. After observing and evaluating Gray for several weeks, hospital staff found no signs that Gray was suffering from a mental illness at the time of the murder. To the contrary, a hospital physician opined that Gray's condition at the time of the murder "did not impair his basic understanding of the nature and quality of his actions nor his ability to recognize right from wrong." J.A. 252. Ignoring the advice of his retained counsel, Gray refused to authorize funds for additional psychiatric examinations or testing. In spite of the attempts made by counsel and Gray's unilateral refusal, Gray later sought collateral relief from his death sentence on the basis that his counsel provided ineffective assistance by failing to adequately investigate his mental health condition in preparation for sentencing. The North Carolina MAR court, closely reviewing Gray's claim, found neither deficient performance nor prejudice.

Now, based primarily on a single assessment six years after the fact, and relying in part on the legally irrelevant state of Gray's mind *after* the murder, the majority indefensibly concludes that the strain of marital difficulties (the effects of which were borne in large measure by Gray's wife) might have driven Gray inexorably towards uxoricide. In doing so, the majority accords no deference whatsoever to the reasoned decision of the MAR court, instead dismissing that court's findings based on no more than its contrary belief, unsupported by the record, that expert mental health evidence regarding the psychological effects of marital strife upon Gray might have made the difference between sentences of life and death. AEDPA, the statute that expressly controls our review of such claims, specifically prohibits the majority's wholesale rejection of the state court findings of fact and conclusions of law.

Because the majority opinion contravenes AEDPA's standard of review, mischaracterizes record evidence, and ignores Supreme Court and Fourth Circuit precedent, I am compelled to dissent.

I.

Before discussing the majority's legal errors, it is first necessary to highlight some of the liberties it takes with the facts. The majority

inflates the importance of affidavits submitted by two doctors, neither of whom evaluated Gray; relies heavily on a single psychiatric evaluation that occurred a full six years after the murder; and glides over the eminently reasonable course of action undertaken by Gray's counsel.

It is probably fair to say, and I doubt the majority would disagree, that Gray was a boorish person. The record reflects that he abused his wife, manipulated his children, was "challenging, confrontational, arrogant and haughty" in counseling, J.A. 227, and, when the marriage disintegrated, attempted to extract negative information about his wife from her doctor for use in the couple's ongoing divorce proceeding. What is missing on this record is any evidence that these actions, or the murder itself, were products of impaired capacity or a diagnosable mental illness.

Indeed, evidence abounds to the contrary. Following an evidentiary hearing, the state MAR court found persuasive testimony that Gray "was calm, in control, and conducted himself normally as a person in 'their right mind' throughout the period of the contentious divorce proceedings and up to the murder itself." J.A. 1563. The MAR court cited the testimony of no fewer than seven witnesses who, the court found, "offered first-hand observation and experience with [Gray] in the days and months *preceding* the murder of [his] wife." J.A. 1564 (emphasis added). The court also placed weight on the statement of Gray's attorney that he would not have allowed Gray to be interviewed by the police on the night of the murder if he had harbored questions about Gray's mental stability. J.A. 1564.

In the face of the MAR court's clear and cogent explication of the record, the majority ignores AEDPA's deferential standard of review and resorts to mining the record for some indication that Gray's evils could have been explained away by psychological factors.

The contrived nature of the majority's support for its conclusions regarding Gray's mental condition is nowhere more apparent than in its reliance on a single sentence, taken out of context, from an affidavit sworn out by Dr. Marshall Barker, Gray's wife's gynecologist, in the couple's divorce proceeding. In his affidavit, Dr. Barker stated,

> Dr. Gray persistently called me and made appearances in my office on numerous occasions to discuss my treatment of his wife. Despite my informing him that such discussion would violate physician/patient confidentiality, he continued to make calls and appearances in my office demanding information about his wife. I realized that by his persistence in making appearances and telephone calls, *he was trying to gather negative information on his wife. I can see from Dr. Gray's behavioral pattern that the behavioral aberration and psychological problem is with him and not his wife.*

J.A. 224 (emphasis added). On cross-examination, Dr. Barker admitted that his *personal* interactions with Gray were limited to *one* telephone conversation lasting approximately twenty minutes. J.A. 789-90. Despite the fact that the reason for the conversation was for Gray to gather negative information about his wife from her gynecologist, the majority would rather use Dr. Barker's "training in psychology" to inflate the significance of his statements about Gray's "psychological problem." *See* Majority Op. at 3; J.A. 224.[1]

---

[1] The actual facts of record put the majority's spin in proper context. Dr. Barker's "training in psychology" involved taking some number of unspecified "courses dealing with psychology" and attending a conference on domestic violence. *See* J.A. 780.

The majority further characterizes Dr. Barker's opinion as suggesting that Gray's psychological issues "included obsessive compulsion." Majority Op. at 3. Significantly, it offers no citation to any such diagnosis, perhaps because there was none. In fact, the only commentary remotely along those lines occurred in the following portion of Dr. Barker's testimony on direct examination, and it can hardly be characterized as a diagnosis:

> Q. Dr. Barker, at the time you were speaking to the defendant, did you formulate any opinion to yourself whether or not he was in control of his mental and physical faculties at those times? Yes or no.
>
> A. He was— Yes. He was in control of his faculties.
>
> Q. Your opinion was what?
>
> A. My opinion that he— if you're asking me is he— was this— If you're asking me, over a telephone conversation,

The majority also relies on an affidavit filed by Ms. Marilyn Huber, the Grays' marital and family therapist. This affidavit, like Dr. Barker's affidavit, is irrelevant to the issue of Gray's mental health. The affidavit concerned Dr. and Mrs. Gray's marital counseling sessions. In the majority's view, it was significant that during these sessions Ms. Huber found Mrs. Gray's behavior "entirely appropriate," and Dr. Gray's, by contrast, "challenging, confrontational, arrogant and haughty." J.A. 227; *see* Majority Op. at 3, 16. Dr. Gray's behavior led Ms. Huber to discontinue their counseling sessions and led her to suggest that Mrs. Gray get psychological counseling for the children "to help them deal with the dissolution of the marriage and the possible pressure . . . being asserted upon them by their father." J.A. 227-28.

In an effort to give these affidavits significance they do not have, the majority skews some facts and takes others out of context. For instance, it is correct that Mrs. Gray's divorce lawyer relied on the affidavits in moving for a court order "for a mental assessment of Gray." Majority Op. at 3. What the majority fails to disclose, however, is that the motion requested that *both* Dr. and Mrs. Gray, as well as their children, be required to submit to mental and physical assessments. Far from serving as evidence of Dr. Gray's psychological condition, the motion is, on its face, no more than an attempt by the

---

did this seem delusional or psychotic, I'm telling you no, it did not.

Q. Did he appear— did you formulate an opinion satisfactory to yourself, other than the agitation, he appeared and sounded to you like he was in control of his mental faculties?

A. I felt he was in control of his mental faculties. He just sounded to me very obsessively compulsive about this situation.

J.A. 789. The only objectively accurate characterization of this colloquy is that it reflects Dr. Barker's view of Gray as mentally sound, but perhaps "obsessively" focused on the marital deterioration for which he bore primary responsibility. However, as with the majority's factual characterizations throughout, its observations here reflect the strain of its efforts to create evidence of a mental disorder that does not exist.

attorney for a non-custodial parent in a divorce proceeding to protect his client from attacks on *her* psychological well-being.

Of course, I agree with the majority that the affidavits could be probative of Gray's counsel's performance to the extent that they raised "red flags" that counsel should have seen, but did not. *See id.* at 12. But a fair reading of the affidavits, as detailed herein, leads to the conclusion that they fail to carry the weight the majority lades them with; no reasonable reading of the affidavits could support the majority's self-serving conclusions that they "were . . . indications of Gray's mental or emotional disturbance" and that they "revealed that Gray had a psychological problem." *Id.* at 16.

Due to the substantive weakness of this purported evidence of Gray's "psychiatric impairment" *prior to* the murder, the majority is forced to rely on events *after the murder and Gray's subsequent arrest*. Gray was placed on suicide watch; fainted during a friend's visit; was described by friends as "damaged emotionally," J.A. 884, and by the jail matron as "VERY depressed," J.A. 889-90; and was described by his own attorney as "dazed" and "appear[ing to be] in a state of shock," J.A. 240, 1702.[2] None of these reactions can legitimately be called unnatural or unexpected for a man just arrested for the brutal murder of his wife. Instead of recognizing this, however, the majority warps time in lumping these post-arrest behaviors into its standardless framework for analyzing Gray's mental health condition *prior to* the murder.

In any event, far from behaving ineffectively, Gray's counsel responded immediately to the concerns raised by these post-arrest behaviors, requesting that his client be committed to Dorothea Dix Hospital to evaluate his capacity to proceed to trial.[3] Gray was subse-

---

[2]Although the attorney wrote in his commitment motion that Gray appeared "unable to understand the gravity of the situation," J.A. 240, he later clarified that he "had no doubts in my mind that [Gray] knew what was going on," but that Gray "looked haggard, worn, worn out, tired, frustrated, and kind of a realization that I'm in trouble. I mean it's dazed like you know, I'm realizing hey, this is serious," J.A. 1702-03.

[3]The majority takes Gray's counsel to task for failing to provide affidavits from Gray's pending divorce case file to the staff at Dorothea Dix.

quently evaluated over the course of several weeks by hospital staff. He presented originally as "tearful, upset, and anxious," oppositional and challenging at times, and angry and frustrated when describing his wife's past behavior. J.A. 245-47. He was resistant to testing, refused to cooperate in many procedures, and displayed arrogance and verbal aggression towards hospital evaluators. The hospital's initial diagnostic impression of Gray was that he "presented an adjustment reaction with mixed disturbance of emotions and conduct in relation to current ongoing stress." J.A. 246. However, after dealing with Gray for several weeks, the hospital's clinical findings indicated "no evident psychosis nor any impairment in this patient's ability to understand his situation and surroundings," and "no findings to suggest evidence of ongoing medical illness." J.A. 251. Dr. Patricio Lara, the forensic psychiatrist who completed Gray's discharge summary, concluded his analysis and opinion as follows:

> Available information describing this patient's condition around the time of the incident in question indicate that he was under ongoing stress related to his family and marital situation. Observations reported by friends describe evidence of preoccupation and distress *and no features to indicate confusion nor any serious impairment in this patient's ability to function*. Based on available information, it is my opinion that this patient's condition at the time in question *did not impair his basic understanding of the nature and quality of his actions nor his ability to recognize right from wrong*. The magnitude of ongoing stressors may have con-

---

*See* Majority Op. at 5. Again, a closer look at the surrounding facts demonstrates the reasonableness of counsel's actions. The case file in question was delivered to one of Gray's trial attorneys a mere eleven days prior to the murder, when he was retained to represent Gray in the divorce case. The attorney had no occasion to review the case file prior to the murder—he and Gray had arranged to go over the file the weekend *after* Thanksgiving, but Gray murdered his wife the night *before* Thanksgiving. Unlike the majority, I find nothing condemnable about an attorney's failure to immediately review a client's divorce case file after that client moots the case by brutally murdering his wife, or his failure to extract from such a file affidavits of dubious relevance to his client's mental health.

tributed to regression in behavior and reductions in impulse control and control of emotions.

J.A. 252 (emphasis added). Dr. Lara then noted that Gray was, *at the time the evaluation was completed*, "undergoing [a] significant amount of distress and could benefit significantly from psychiatric counseling." J.A. 252-53.[4]

Dr. Lara concluded the discharge summary with the following statement, which the majority attempts to imbue with significance: "If other sources of information become available to describe this patient's functioning and condition prior to [the murder], I would be glad to review the information to expand my opinions if possible in regards to this patient's condition at the time of the alleged offense." J.A. 253; *see* Majority Op. at 5, 12, 13, 15, 16, 21, 26 (referring to this statement as, among other things, an "offer" to provide "additional assistance" and an "offer of mental health investigation assistance"). The limits of this comment should be readily apparent. It suggests only a willingness to revisit the diagnosis of "no impairment" should additional evidence be forthcoming.[5]

The one potential "red flag" to be found in the hospital discharge summary was nonspecific and equivocal: "The magnitude of ongoing stressors *may have contributed* to regression in behavior and reductions in impulse control and control of emotions." J.A. 252 (emphasis added). Contrary to the majority's repeated reference to the "many

---

[4]Once again, the majority conflates observations related to Gray's post-arrest behaviors with his condition prior to the murder. It should surprise no one that Dr. Lara suggested psychiatric counseling for Gray after his arrest for the brutal murder of his wife, and that Dr. Lara indicated that Gray, in his post-arrest condition, might benefit from medication.

[5]The majority also relies on the assertion that Dr. Lara's assistance would have been given "free of charge." Majority Op. at 13, 15. The only support for this assertion is Dr. Lara's affidavit, executed on June 7, 2006, thirteen years after Gray's trial and six years after the MAR proceedings. This affidavit was considered by neither the MAR court nor the district court and should not have been considered by this court on habeas review. *See Bell v. Jarvis*, 236 F.3d 149, 171 n.13 (4th Cir. 2000).

signs" of Gray's mental or emotional instability, there were in fact few, if any, facts in this record that might have led a reasonable attorney to believe that Gray was laboring under a diagnosable mental or emotional impairment at the time that he murdered his wife.

After reviewing the Dorothea Dix discharge summary, Gray's attorney recommended that they retain an independent psychiatrist to evaluate Gray and to be on standby for the trial and, if necessary, sentencing. J.A. 1660, 1663-64. Gray refused, telling his paid attorney "not to spend another f'ing penny on this trial, [and] that he didn't need a psychiatrist." J.A. 1666. Gray forbade his attorney to retain an independent psychiatrist and declined to authorize the expenditure of funds for a psychiatrist, even though he had authorized funds for other experts, including a surveyor and an expert on jury selection. J.A. 1665-66.

Faced with an absence of evidence from the time period leading up to the murder that Gray suffered from a diagnosable mental or emotional disorder, and counsel's appropriate response to the circumstances at the time, the majority is forced to rely on the opinion of a doctor hired six years *after* the murder to support the conclusion it seeks—that Gray suffered from a mental illness or acted with impaired capacity when he killed his wife.

Gray was sentenced to death in December 1993. The testimony and affidavit of Dr. James Bellard, a psychiatrist, were submitted at the MAR hearing in 1999. Dr. Bellard interviewed Gray for a total of four hours in January 1999. He reviewed only the records of the Grays' family and marital therapist, the discharge summary from Dorothea Dix, and the North Carolina Supreme Court holdings in Gray's case. (Bellard Aff., J.A. 275.)[6] Based on this limited information, Dr. Bellard opined that Gray "did at the time of the offense . . . and does at the current time suffer from a psychiatric illness, specifically, Para-

---

[6]The majority again engages in judicial puffing when it states that Dr. Bellard "reviewed excerpts of the trial record." Majority Op. at 8. Dr. Bellard reviewed the testimony of only *one* witness-—Dr. Gridley, Gray's son's counselor—and the testimony of Gray himself. J.A. 1752, 1756. Tellingly, Dr. Bellard's affidavit, which detailed the bases for his psychiatric opinion, did not even mention these trial record excerpts.

noid Personality Disorder (DSM Code 301.0)." *Id.* Dr. Bellard further offered his opinion that Gray might suffer from other psychiatric disorders and that expert psychiatric testimony would have been useful to the jury in Gray's case because it would have supported the submission of at least two statutory mitigating factors. J.A. 275-76.[7]

The state MAR court reasonably discounted Dr. Bellard's testimony both because his contact with Gray occurred six years after the murder and because Dr. Bellard had not reviewed the trial testimony of Gray's friends, relatives, and associates describing Gray's conduct in the months leading up to the murder. J.A. 1562-63. Relying on extensive evidence and testimony of no fewer than seven witnesses with knowledge of Gray's behavior *prior to* and *at the time of* the murder, the MAR court concluded that available evidence, including both the evidence actually presented at sentencing and that which Gray contended should have been presented but was not, demonstrated that Gray was in full control of his mental faculties and his ability to reason at the time of the murder. J.A. 1566. To conclude that the result of Gray's trial would have been different if the "missing" evidence had been presented, the MAR court held, would require "leap[s] of speculation." *Id.* The court therefore rejected Gray's ineffective assistance claim, finding that he had failed to show either that his attorney's performance was deficient or that any deficiency resulted in prejudice. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

## II.

The serious errors in the majority's cavalier recitation of the facts are compounded by its perplexing legal analysis. Though the majority sets forth the proper framework for AEDPA review, it wholly disregards its application.

---

[7]The factors Dr. Bellard noted were that "the capital felony was committed while the defendant was under the influence of mental and emotional disturbance," and that "the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was impaired." J.A. 276.

Federal habeas relief is available to state prisoners only when state court proceedings (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States"; or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). A state court decision is "contrary to" established federal law if the state court "applies a rule that contradicts the governing" Supreme Court precedent or confronts facts that are "materially indistinguishable" from those presented in a relevant Supreme Court decision and arrives at the opposite result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000).

An "unreasonable application" of clearly established federal law "occurs when a state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] petitioner's case." *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (internal quotations omitted). To warrant the extreme remedy of federal intrusion into state criminal adjudications, it is not enough "[that] a federal court believes the state court's determination was incorrect"; the relevant question is "whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 127 S. Ct. 1933, 1939 (2007) (citing *Williams*, 529 U.S. at 410). In habeas cases,

> [f]actual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, . . . and a decision adjudicated on the merits in state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding.

*Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003). Accordingly, this court has recently reaffirmed that "federal courts are to accord considerable deference to state courts in their review of state habeas proceedings." *Meyer v. Branker*, 506 F.3d 358, 365 (4th Cir. 2007) (citing *Williams*, 529 U.S. at 412-13).

### III.

The crux of Gray's petition is his ineffective assistance of counsel claim. To prevail on such a claim under *Strickland*, a petitioner must

establish both that counsel's performance was deficient and that the deficiency prejudiced the defense. 466 U.S. at 687. The majority concludes, as it must in order to grant relief, that the North Carolina MAR court engaged in an unreasonable application of Supreme Court precedent concerning *both* components of *Strickland*. The majority first holds that Gray's counsel rendered deficient performance "by failing to investigate and develop, for sentencing purposes, evidence that Gray suffered from a severe mental illness." Majority Op. at 2. This portion of the majority opinion is grounded in its determination that Gray's attorneys' investigation was "unreasonable under prevailing professional norms." *Id.* at 16.

After arriving at its conclusion regarding deficient performance, the majority further concludes that there is a reasonable probability that this failure prejudiced the outcome at sentencing. *Id.* at 24. In the majority's view, the MAR court applied the wrong standard for evaluating prejudice, and the MAR court's decision was an "unreasonable application of the proper standard." *Id.* at 19. I find each of these holdings to strain reason and confound well-established law.

A.

The precedents governing our analysis of *Strickland*'s deficiency prong are clear. An attorney's performance is measured using the standard of "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. "American Bar Association standards and the like . . . are guides to determining what is reasonable." *Id.* The Supreme Court has made clear that ABA standards such as the American Bar Association Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases ("ABA Guidelines") are "*only* guides," not requirements. *Id.* (emphasis added); *see also Rompilla*, 545 U.S. at 400; *Wiggins v. Smith*, 539 U.S. 510, 543 (2003). Other guides might include, but are not limited to, state-specific standards and the actual courtroom practice of capital defenders in the relevant jurisdiction or nationwide. *See Marshall v. Cathel*, 428 F.3d 452, 467-68 (3d Cir. 2005). In utilizing any guide to determine reasonableness, *Strickland* requires courts to be "highly deferential" to attorneys' strategic choices to avoid the "distorting effects of hindsight." 466 U.S. at 689. This court recently explained,

> In the sentencing context, this "highly deferential" standard means that defense counsel have the flexibility to vary their approach given their client's unique circumstances. *See Lovitt v. True*, 403 F.3d 171, 179 (4th Cir. 2005) ("In many cases, counsel's decision not to pursue a particular approach at sentencing reflects not incompetence, but rather a sound strategic choice."). This is exactly as it should be: the touchstone of effective representation must be sound, evidence-based judgment, *rather than a set of mandates counsel must programmatically follow without deviation.* "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688-89.

*Meyer*, 506 F.3d at 371 (emphasis added).

The majority wisely concedes that the ABA Guidelines provide only advice and suggestions of "avenue[s] of investigation that counsel *should* consider," and that in this context they "can be relevant" to determinations of what constitutes reasonable performance but "certainly cannot be dispositive in and of themselves." Majority Op. at 11 (citing *Meyer*, 506 F.3d at 372.) (emphasis added). In doing so, the majority recognizes the Supreme Court's admonition that programmatic rules "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. Indeed, the existence of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause." *Strickland*, 466 U.S. at 689 (internal citation omitted).

Nevertheless, by finding that an in-depth mental health investigation was required on these facts, the majority effectively calls for a per se rule that such an investigation is required in *every* death penalty case, a result both this court and the Supreme Court have expressly rejected. *See Meyer*, 506 F.3d at 371-72; *Strickland*, 466 U.S. at 689.

The majority's opinion "ignore[s] the very basic fact that different circumstances often require different strategies." *Meyer*, 506 F.3d at

372; *see Strickland*, 466 U.S. at 689; *Frye v. Lee*, 235 F.3d 897, 904 n.7 (4th Cir. 2000). Here, defense counsel, facing the circumstances presented in Gray's case, attempted to demonstrate at sentencing that Gray, after a lifetime of good behavior, made a tragic mistake in a moment of weakness due to the dissolution of his marriage and the hospitalization of his mother. *See* J.A. 1439 (defense counsel's statement during closing argument that "overall, [the jury will] be looking at a few days in 1992 versus a whole life time of 42 plus years"); J.A. 1442 (closing argument statements contrasting a lifetime of conforming to society's rules with a few "non-conform[ing]" events).[8] The mental or emotional disturbance mitigating factor played a role in this overarching theory, as elucidated by the jury instruction suggested by counsel, J.A. 1455, and the similar instruction ultimately given by the court:

> For this mitigating circumstance to exist it is enough that the defendant's mind or emotions were disturbed from any cause and that he was under the influence of the disturbance when he killed the victim.
>
> You would find this mitigating circumstance if you find that the defendant was under mental or emotional stress as a result of his break up—the break up of the family marital unit and/or the mental or emotional stress of the hospitalization of his 82-year-old-blind mother and the uncertainty of her prognosis; and that as a result of this, the defendant was under the influence of mental or emotional disturbance when he killed the victim.

J.A. 1475-76.

Defense counsel's approach met with some success, leading the jury to find thirteen of the twenty-one mitigating factors proffered, including that Gray was a loving father, a loving son who had cared for his mother at her time of need, a contributor to the community,

---

[8]Much of the testimony at the sentencing hearing supported this theory by highlighting the strength of the Grays' marriage in its early years, Gray's excellent work in his career as a dentist, and Gray's dedication to his children as a little league coach and a loving father.

and that "[f]or 42 years prior to his separation from Roslyn Gray, Defendant led an uneventful, law-abiding life posing no threat to his family or community." J.A. 740. The jury did not find the mental health mitigating factors, and it ultimately recommended death. However, that defense counsel did not prevail in avoiding a death sentence does not transform its mitigation strategy into ineffective assistance. *See Strickland*, 466 U.S. at 689 ("It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable."); *Lovitt*, 403 F.3d at 179 (noting that, to pursue a particular theory at sentencing, though it may ultimately fail, often "reflects not incompetence, but rather a sound strategic choice").

The diligence and cautiousness of Gray's counsel bear repeating. They began their investigation immediately after the murder by having Gray committed for a weeks-long evaluation at Dorothea Dix Hospital. They later made the reasonable choice to forgo additional in-depth mental health investigation based on Dr. Lara's evaluation and their overall assessment of the case, including all available evidence, their own observations of their client, and their client's refusal to authorize funds for experts and his insistence that further psychiatric evaluation was unnecessary.[9]

The circumstances here did not demand that Gray's sentencing strategy include procuring expert mental health testimony. Gray's initial psychiatric evaluation found no evidence of impairment at the time of the murder. Gray's attorneys nevertheless approached Gray about hiring a mental health expert to be "on standby," though they did not necessarily intend to use psychiatric evidence. When Gray refused to authorize funds for such an expense, they did not press the

---

[9]Of course, counsel cannot blindly accept a client's opinion regarding his own mental health as fact. But it would be equally suspect for an attorney to ignore a client whose self-assessment found abundant support and minimal contraindication in the record and comported with the attorney's own reasoned judgment. *See Strickland*, 466 U.S. at 691 ("The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions.").

matter. "[S]trategic choices made after less than complete investigations are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91. "*Strickland* does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533. Contrary to the majority's analysis, a fair reading of this record leads to the inescapable conclusion that the investigation undertaken by Gray's counsel was reasonable.[10]

Counsel's reasonable performance continued at sentencing. The majority is simply incorrect in asserting that "Gray's counsel did not present (or attempt to present) *any* evidence at sentencing" that Gray was under mental or emotional strain when he murdered his wife.[11] Majority Op. at 25. In fact, the trial court found that sufficient evidence had been presented to justify submission of the mental health mitigating factors to the jury. A number of *lay witnesses*, at trial and at sentencing, testified that Gray was under significant stress and acting out of character at the time of the murder.[12] This testimony sup-

---

[10]Inexplicably, the majority mischaracterizes my opinion as failing to "pursu[e] the . . . argument that Gray's counsel undertook a reasonable *investigation*." Majority Op. at 18. But this is precisely the argument I am making—that counsel's investigation was, *under the circumstances known to him at the time*, reasonable.

[11]The majority's statement is most directly contradicted by a comment from defense counsel Worthington's closing argument at sentencing: "You heard Charles Buchanan, a life-long friend talk about Mr. Gray's mother [whose hospitalization, Buchanan had explained, caused Gray considerable distress], and this is the mitigating factor, the felony was committed while the defendant was under the influence of mental or emotional distress." J.A. 1430.

[12]*See, e.g.*, J.A. 1289 (Charles Buchanan, a friend of the Grays, testifying at sentencing that the couple was very close throughout their marriage, until early 1992, and that at that point the dissolution of the marriage was "tearing [Gray] up"); J.A. 802 (Debbie Ryals, another friend of the Grays, indicating that in the period leading up to the murder Gray "didn't appear to be in his right mind" and spoke violently about his conflicts with his wife); J.A. 822 (Don Hollowell, another friend of the Grays, testifying that after the couple's separation Gray was "very disturbed" and "didn't have a grasp of what was going on").

ported defense counsel's sentencing theory, in particular its argument that the jury should find the mental or emotional disturbance mitigating factor because Gray "suffered from stress or a stressful situation as the result of the break up of the family marital unit and as a result of stress caused by the hospitalization of the defendant's mother." J.A. 1455.

The majority leaves no doubt that it would have taken a different approach at sentencing. The majority's preferred strategy, concocted with the benefit of hindsight, grows out of its conviction that "mental health mitigating factors . . . were Gray's best hope of convincing the jury that he did not deserve the death penalty." Majority Op. at 21. The majority opines that "[t]he missing *expert* evidence on Gray's impaired mental condition would have provided the essential support for these factors." *Id.* (emphasis added). In so deciding, the majority faults Gray's counsel because, the majority suggests, "There is no indication that [defense counsel] understood that *expert* mental health evidence could be critical to the jury's decision on sentencing." *Id.* at 15 (emphasis added).

Regrettably, this speculation calls defense counsel to account for a failure to pursue the majority's preferred strategy, based on the majority's forecast of what evidence "would have" been provided and what that evidence "could" have done in the jury's minds. Contrary to the majority's assertion, however, there is no objective evidence that its favored strategy was the "best," or even that its strategy offered greater promise than defense counsel's chosen course. Therefore, the only way the majority here could rightly condemn defense counsel's actions would be if a *per se* rule required the presentment of expert mental health mitigation evidence. But that is not the law. *Meyer*, 506 F.3d at 372 ("No *per se* rule requires the presentment of [mental health mitigation] evidence at trial.").

The majority's opinion, then, is precisely the type of overreaching condemned by *Strickland* and its progeny. Today, two jurists, with the benefit of hindsight, discard the high degree of deference owed to defense counsel's strategic choices, and replace it with an attempt to mandate that sentencing strategies in death penalty cases always include presentation of *expert* mental health testimony. The opinion is grossly out of step with the flexible approach required under

Supreme Court and Fourth Circuit precedent. *See Meyer*, 506 F.3d at 371-72; *Strickland*, 466 U.S. at 688-89. Under AEDPA's highly deferential standard of review, there is no basis for any conclusion other than that counsel's approach to the investigation of Gray's mental health was marked by reasonable professional judgments, that counsel's performance was not deficient, and that the MAR court did not unreasonably apply Supreme Court precedent in so finding.

B.

The majority's opinion regarding prejudice is even more problematic. William Robert Gray murdered his wife in the driveway of his home after she begged a passerby for assistance. In the face of overwhelming evidence of guilt, which it wisely does not address, the majority is faced with the difficult task of showing that psychological testimony might have made a difference. By any objectively reasonable standard, it would not.

Under North Carolina law, a habeas petitioner "must demonstrate a reasonable probability that at least one juror would have found that his new mitigating evidence, combined with the existing mitigating evidence, outweighed the aggravating circumstances." *Buckner v. Polk*, 453 F.3d 195, 203 (4th Cir. 2006). This court applies a heavy measure of deference to the MAR court's conclusion regarding prejudice:

> Even if on de novo review we might strike a different balance concerning the relative weight of the aggravating and mitigating evidence, we may not disturb the MAR court's conclusion that [the petitioner] did not demonstrate prejudice unless we find that conclusion to be unreasonable in light of clearly established Supreme Court precedent or in light of the evidence before the MAR court. *See* § 2254(d)(1)-(2). When determining whether [the petitioner] has satisfied one of these two standards, we must presume the MAR court's factual findings to be correct unless [the petitioner] provides clear and convincing evidence to the contrary. *See* § 2254(e)(1).

*Id.*

After an exhaustive hearing, the MAR court rejected Gray's ineffective assistance claims in a 45-page order. The court "f[ou]nd that the record contains persuasive testimony from State and defense witnesses that defendant was calm, in control, and conducted himself normally as a person in 'their right mind' throughout the period of the contentious divorce proceedings and up to the murder itself." J.A. 1563. The witness testimony cited by the court "offered first-hand observation and experience with defendant in the days and months preceding the murder." J.A. 1564. In light of this evidence, the court rejected Gray's contention that there was a reasonable probability that the presentation of other mental health evidence would have changed the outcome of his trial. As a result, the court found that Gray failed to satisfy *Strickland*'s prejudice prong.

The majority first suggests that the state court applied the incorrect standard. In its order, the state court wrote, "Even with the proffered medical testimony this [c]ourt finds it to be a leap of speculation that the jury would necessarily have found the existence of the statutory and nonstatutory mitigating circumstances." J.A. 1566. The majority reads this statement out of context to show that the MAR court required certainty when all that was required under *Strickland* was a reasonable probability of a different outcome. However, the next sentence in the MAR court opinion suggests that the MAR court plainly understood the proper standard: "It is a further leap of speculation that there is a reasonable probability that the result of defendant's trial would have been any different." *Id.* Despite its inartful word choice, the MAR court applied the correct standard.

Next, the majority questions the MAR court's failure to engage in an explicit reweighing of all available mitigation evidence, including expert mental health evidence, against the case in aggravation. In so doing, the majority attempts to obscure the obvious: that other than the proffered testimony of Dr. Bellard, which the MAR court fully considered but ultimately found unpersuasive, *there was no additional expert mental health evidence* to add to the mitigating side of the balance. Under these circumstances, an explicit discussion of the reweighing process would have been farcical.[13]

---

[13]The majority also ignores the significance of the Supreme Court's recent decision in *Schriro v. Landrigan*, 127 S. Ct. 1933 (2007). In

The majority's substitution of its factual findings for those of the MAR court is legally impermissible, *see Buckner*, 453 F.3d at 203, and makes a mockery of the principles of federalism underlying habeas review. Moreover, the majority's doe-eyed view of what Gray might have presented and its resultant conclusion notwithstanding, a dispassionate analysis of the entire case in mitigation suggests that it would have been strengthened little, if at all, by the proffered mental health evidence. Indeed, much of the omitted evidence would likely have harmed Gray's case as much as, or more than, it would have helped.

Numerous lay witnesses, including Gray himself, testified at trial and at sentencing in support of defense counsel's theory that Gray had been a loving father, son, and spouse, who became increasingly troubled under the strain of the break-up of his marriage and the fading health of his mother. Additional lay witness testimony to these issues would have been duplicative, and therefore must be discounted under our precedent. *See Buckner*, 453 F.3d at 207. *See also Bowie v. Branker*, 512 F.3d 112, 121 (4th Cir. 2008). Furthermore, in evaluating the possible prejudice resulting from counsel's failure to procure additional testimony on these topics, one must recognize that the existing testimony regarding Gray's erratic and overly emotional behavior during the couple's separation accompanied observations that he was in full control of his mental faculties at the time of the murder. *See, e.g.*, J.A. 822-24, 831. Therefore, additional lay testimony in this vein likely would also have been double-edged. *See Moody v. Polk*, 408 F.3d 141, 152 (4th Cir. 2005).

The majority fails to recognize the centrality of this abundant *lay* witness testimony to defense counsel's mitigation theory. Counsel

*Schriro*, the Supreme Court emphasized that reviewing courts must assess reasonableness from the perspective of the state postconviction court *at the time it made its decision. Schriro*, 127 S. Ct. at 1942. When the MAR court issued its decision in this case, it was not objectively unreasonable for a state postconviction court to conclude that a defendant could not establish prejudice after refusing to allow his counsel to obtain mental health evidence in support of the case in mitigation. *See id.* The majority's analogy to *Rompilla*, Majority Op. at 15, in support of the contrary conclusion is misguided; *Rompilla* was unavailable to the MAR court at the time it made its decision.

chose to focus on Gray's mental and emotional stress and chose *not* to attempt to demonstrate the existence of a diagnosable mental or emotional impairment. To support its chosen theory, counsel was able to rely on numerous firsthand observations of Gray in the time period before the murder. The available evidence from *medical profession-als*, suggesting that Gray did not suffer from a diagnosable mental illness, only bolstered counsel's choice to focus on lay witness testimony. *See* J.A. 789 (Dr. Barker, commenting that "[he] felt [Gray] was in control of his mental faculties. He just sounded to me very obsessively compulsive about this situation."); J.A. 252 (Dr. Lara's evaluation, summarizing, "[I]t is my opinion that this patient's condition at the time in question did not impair his basic understanding of the nature and quality of his actions nor his ability to recognize right from wrong," but that "[t]he magnitude of ongoing stressors may have contributed to regression in behavior and reductions in impulse control and control of emotions.").

Nevertheless, the majority holds that defense counsel's failure to procure *expert* witness testimony prejudiced Gray because the supposedly "missing" expert testimony—in particular, the testimony of Dr. Bellard—would have demonstrated that Gray suffered from Paranoid Personality Disorder at the time of the murder.[14]

The majority fails to acknowledge several glaring substantive weaknesses of its assertion that expert evidence would have aided Gray. First, the expert evidence ostensibly missing from the case in mitigation would likely have been double-edged. For example, had defense counsel called Dr. Lara, the forensic psychiatrist from Dorothea Dix, to provide expert testimony in mitigation, he could have testified to the initial diagnostic impression of Gray as presenting "an adjustment reaction with mixed disturbance of emotions and conduct

---

[14]The majority's star witness, Dr. Bellard, acknowledged that paranoid personality disorder requires evaluation of an individual's long-term patterns and functioning, and manifests itself by late adolescence or early adulthood. J.A. 1753. Such a diagnosis would thus cut directly against defense counsel's mitigation theory that Gray was a normal, healthily functioning adult and a loving father, son, and husband, up until the dissolution of his marriage and his mother's hospitalization. *See supra* Part III.A.

in relation to current ongoing stress." J.A. 246. However, he would have also had to acknowledge that observing Gray shortly after the murder and his subsequent arrest presented "an extreme situation that may [have] exaggerate[d] personality traits to a level that may [have] appeare[d] pathological." J.A. 251. Of course, he would also have had to admit that the hospital found "no evident psychosis nor any impairment in this patient's ability to understand his situation and surroundings," and "no findings to suggest evidence of ongoing medical illness." *Id.* In addition, he would have been constrained by his own opinion, included in the discharge summary, "that [Gray's] condition at the time in question did not impair his basic understanding of the nature and quality of his actions nor his ability to recognize right from wrong." J.A. 252. In the best-case scenario for Gray, testimony by Dr. Lara would have been internally inconsistent and would have also severely undercut the proffered testimony of Dr. Bellard. Our precedent demands that we discount such equivocal mental health evidence. *See Bowie*, 512 F.3d at 121 (holding that equivocal mental health evidence failed to demonstrate "a reasonable probability that the jury would not have recommended death"); *Moody*, 408 F.3d at 152.

Second, Gray failed to present any evidence to contradict the MAR court's reasoned decision to discount the proffered expert testimony of Dr. Bellard.[15] Even were the MAR court wrong to discount this tes-

[15]The majority suggests that the MAR court's reasons for discounting Dr. Bellard's testimony were "objectively unreasonable." Majority Op. at 22. The first factor in the MAR court's decision was the fact that Dr. Bellard's opinion, based on a total of four hours spent with Gray, took place *six years* after the murder. I fail to see how the brevity of the evaluation and the significant time gap between the murder and the evaluation were "objectively unreasonable" factors for the MAR court to have considered. The MAR court also found it significant that "Dr. Bellard had not reviewed the trial testimony which set forth defendant's actions and conduct in the days and months leading up to the murder . . . as well as the friends relatives, and associates of defendant." J.A. 1562. Instead of recognizing the reasonableness of discounting Dr. Bellard's testimony on this basis, the majority instead highlights the sliver of the trial record that Dr. Bellard *did* review: the testimony of *one* witness, Gray's son's counselor; the testimony of Gray himself; and two affidavits. That Dr. Bellard

timony, the evidence the majority finds that the jury "would have heard" from Dr. Bellard, Majority Op. at 21, pales in comparison to the evidence presented in cases in which prejudice has been found. *See Williams*, 529 U.S. at 395 & n.19 (finding prejudice from counsel's failure to present evidence of the defendant's "nightmarish childhood," which included criminal neglect and physical abuse of the defendant by his parents); *Wiggins*, 539 U.S. at 536 (finding prejudice from counsel's failure to alert the jury to the defendant's borderline mental retardation and severe childhood physical and sexual abuse).

Neither Gray nor the majority has shown the state MAR court's conclusions respecting potential prejudice on the available body of evidence to be unreasonable in light of clearly established Supreme Court precedent, *see* § 2254(d)(1)-(2), or rebuttable by clear and con-

---

performed this limited review does nothing to lessen the import of the evidence Dr. Bellard *failed* to review and the reasonableness of the MAR court's recognition of the resulting limits of Dr. Bellard's testimony.

Finally, the majority grasps at straws in noting that "[t]he DSM-IV diagnostic criteria . . . nowhere states, as the MAR court asserted, that interviewing other individuals 'is important to making the diagnosis.'" Majority Op. at 22 (quoting J.A. 1562). The MAR court wrote, and Dr. Bellard agreed, that "[t]he testimony or observations of individuals with knowledge of defendant's behavior and personality during defendant's late adolescence and early adulthood is important to making the diagnosis arrived at by Dr. Bellard." J.A. 1562; *see* J.A. 1753. The MAR court then commented, "This is noted by the manual Dr. Bellard himself utilizes, the . . . DSM-IV." *Id.* at 1562-63. The majority pounces on this line, saying that "the MAR court drastically mischaracterized the diagnostic requirements of the DSM-IV." Majority Op. at 22. However, assuming the DSM-IV does not make the MAR court's point directly, the MAR court's statement was a fair inference from Dr. Bellard's testimony and not remotely suggestive of any objective unreasonableness in the MAR court's opinion. *See* J.A. 1753 (testimony of Dr. Bellard, admitting that the DSM-IV requires an evaluation of an individual's long-term patterns and functioning; that paranoid personality disorder, the diagnosis given Gray by Dr. Bellard using the DSM-IV, usually manifests by late adolescence or early adulthood; and that it therefore would have been useful to talk to people who knew Gray during this time-period in his life).

vincing contrary evidence, *see* § 2254(e)(1). Instead, finding no reasonable basis for an assault on the state MAR court's opinion under AEDPA, the majority departs from the statutorily prescribed boundaries that should cabin its review. So situated, and free to maneuver without the nettlesome requirements of statute, precedent, and standards of review, the majority casts aside the MAR court's opinion and conducts its own analysis in the first instance, concluding that Gray's mitigation case, with Dr. Bellard's opinion added, would have been "quite powerful." Majority Op. at 23.[16] In so concluding, it ignores the heavy measure of deference usually afforded defense counsel's strategic decisions, instead deciding on its own what strategy presented "Gray's best hope of convincing the jury that he did not deserve the death penalty." Majority Op. at 21. With its preferred result in sight, the majority "weighs" a "powerful" mitigation case of its own making against the state's evidence in support of the death penalty and concludes, unsurprisingly, that there is a reasonable probability that the jury would have returned with a different sentence.

Contrary to the majority's analysis, given the deferential AEDPA standard of review, the substantive weakness of the new evidence, and the failure of Gray and the majority to rebut the MAR court's adverse treatment of Dr. Bellard's opinion, our precedent dictates that the MAR court's findings on prejudice should have been allowed to stand. *See Buckner*, 453 F.3d at 207.

IV.

For the foregoing reasons, I dissent from the portion of the majority opinion reversing the judgment of the district court. I concur in the majority opinion to the extent it affirms the district court's judgment.

---

[16]The majority speculates that Gray's counsel "could have introduced expert testimony *such as* that of Dr. Bellard . . . ," and then further speculates about what a jury "would have heard from such an expert." Majority Op. at 21 (emphasis added). The majority cannot now manufacture a hypothetical expert super-witness who would have given Gray helpful testimony while somehow avoiding the deficiencies noted by the MAR court in its decision, after full consideration, to discount Dr. Bellard's opinion.